UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PROTOCOL ELECTRONICS, INC. | Hon. Stanley R. Chesler, U.S.D.J. |
| Plaintiff, | Civ. No. 03-4162(SRC) |
| v. | |
| | **OPINION** |
| TRANSOLUTIONS, INC., and CERNER CORPORATION | |
| Defendants. | |

This matter comes before the Court on the motion of Defendants, Transolutions Inc. and Cerner Corporation for summary judgment as to all counts of Plaintiff's Amended Complaint. The motion has been decided upon the written submissions of the parties pursuant to Federal Rule of Civil Procedure 78.  For the reasons given below, the motion will be granted in full.

**I.   BACKGROUND OF THE CASE**

The following facts are undisputed unless otherwise noted.  Plaintiff Protocol Electronics, Inc. ("Protocol") is a corporation organized under the laws of New Jersey and located in Lambertville, New Jersey.  Amended Complaint ("Compl.") ¶ 1.  Protocol is engaged in the business of developing computer software and hardware.  Deposition of Jay B. Ross ("Ross"), President of Protocol ("Ross Dep.") at 6, 14, 35-37.  Ross is the sole shareholder, officer and director of Protocol.  Id. at 12-13.

Defendant Transolutions, Inc. ("TSI") is located in Lake Bluff, Illinois and is organized under the laws of Delaware.  Affidavit of David Navin, Vice President of TSI ("Navin Aff.") ¶ 3.

TSI is in the business of transcribing medical reports dictated by physicians for its client hospitals. Id.

Defendant Cerner Corporation ("Cerner") was formed in 1980 and is also organized under the laws of Delaware. Affidavit of Scott Stuewe, Director of Application Architecture for Cerner ("Stuewe Aff.") ¶ 4. Cerner's principal place of business is located in North Kansas City, Missouri. Id. Cerner is engaged in the business of supplying health care information technology systems, as explained in more detail below. Id. at ¶ 5.

Since 1995, TSI has used for the transcription of its medical reports an automated transcription system run in substantial part on two DOS-based platforms. Defendant's Statement of Material Facts Pursuant to Local Rule 56.1 ("Def. Facts.") ¶ 2. These systems are used in conjunction with a voice-mail telephone system through which the physicians of TSI client hospitals dictate their medical reports to TSI. Id. ¶ 3. Under this system, the physician dictates his or her medical report through the telephone lines into a voice-mail system controlled at TSI. Id. A TSI transcriptionist will thereafter access the physician's voice-mail, transcribe the dictation and then transmit the transcribed medical report to TSI for processing and delivery to the client facilities. Id. TSI maintains, and Protocol disputes, that this telephone-based system, exclusively, remains in use by TSI for its transcription services. Navin Aff. ¶ 4. Protocol argues that, in fact, TSI has been using an Internet based system. But for reasons detailed below, whether or not TSI continues to use a telephone-based transcription system, or uses some other, possibly internet-based system is immaterial to this Motion.

Before the events at the core of this lawsuit, in early 2001, TSI entered into negotiations with Protocol for the development of an Internet-based, automated transcription system for the

2

purpose of alleviating the high costs and inefficiencies of a telephone-based system.  Id. ¶ 6.  These negotiations culminated in a Joint Development Agreement ("JDA") dated May 22, 2001 between TSI and Protocol for the development of an automated transcription system referred to in the JDA as "TMS."  Id.  Section 1.1 of the JDA provides that "[t]he parties will work together" as set forth in the Agreement "to develop TMS, a specialized product that facilitates the process of transcribing medical dictation audio files."  Unlike TSI's current system, TMS was to be Internet-based and was not designed to run on DOS.  Navin Aff. ¶ 7; Ross Dep. at 141, 210-211.

Section 3.1 of the JDA, "Base Project Fees," requires TSI to pay Protocol $125,000 consideration, in specified installment payments, which amount was subsequently increased to a total of $175,000, pursuant to letters dated May 6, 2002 and July 29, 2002.  See Navin Aff. ¶ 10; Ross Dep. at 28, 224-228; Def. Ex. J, K (letter amendments to the JDA).  It is undisputed that TSI paid to Protocol all "Base Project Fees" under the JDA and under the aforesaid letters.  Id.  Further, it is also undisputed that Protocol delivered its final version of TMS on October 13, 2002.  Compl. ¶ 37; Navin Aff. ¶ 11.

After having an independent expert, Robert Gezelter, evaluate essential portions of the TMS code, specifically the essential "Central System," TSI determined that TMS was not, and never would be, functional.  See Def. Facts ¶13;  Plaintiff's Exhibit ("Plt. Ex.") J (letter from Protocol describing, *inter alia*, the importance of the Central System).  After Gezelter's evaluation of TMS, on December 4, 2002, TSI sent Protocol a letter purporting to terminate the JDA effective January 3, 2003.  See Def. Ex. W.  TSI claims, that due to the failure of the program, it wrote off its entire investment in TMS (including related hardware) totaling

$209,616.30.  Def. Facts ¶ 16.

Protocol does not dispute Gezelter's qualifications as an expert nor does it offer an opposing expert opinion, see Revised Joint Final Pretrial Order at 42, 45.  While a factual dispute remains over whether TMS was ever functional, for the reasons discussed below, these facts are immaterial to the resolution of this Motion.

TSI maintains, that it has never used TMS or the TMS source code for any purpose, nor has it ever disclosed or made available the source code of TMS to any third party, including Cerner, other than to its expert Robert Gezelter.  Id.  TSI maintains that it has never received any revenues as a result of the distribution, sale, license, maintenance and support of any automated transcription system, including TMS or APEX,(the system it now has under development) or any components or derivatives thereof.  Id.

Protocol's contrary position is that TSI, and others, have used and continue to use TMS, or derivatives thereof, to provide Internet based transcription services.  See Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment ("Plt. Opp. Mem.") at 23, 25, 27.  To support this assertion, Protocol relies on the fact that, in 2002 while the JDA was still in effect, a page of TSI's website included a reference to TMS.  See Plt. Opp. Mem. at 27.  It is undisputed, however, that the website presented no offer for sale or license of TMS, but presented TMS as one of many "tools for use by [TSI] clients and employed transcriptionists."  See Plt. Ex. O (printout of page from TSI's Internet website (dated 2002) announcing use of TMS by TSI).  TSI admits that the reference was prepared and published on the web in anticipation of the completed TMS system.

On October 25, 2002, when the JDA was still effect, TSI and Cerner entered an

4

agreement (the "Cerner Agreement"), under which TSI became licensed to utilize a Cerner program called Millennium Objects. See Def. Ex. S, Cerner Agreement. Millennium Objects is a software "toolkit" that permits TSI, and other licensees, limited access to Cerner's main database, Cerner Millennium, which is the core of Cerner's business.[1] In particular, TSI is licensed to use Millennium Objects to access the patient demographic information ("admit, discharge and transfer" or "ADT") of participating Cerner healthcare clients contained in Cerner Millennium and to add ADT information to the medical reports it transcribes for participating Cerner healthcare clients. Def. Facts ¶ 29. TSI is also licensed to deposit its finished transcribed medical report for such clients in the Cerner Millennium database. Id. Finally, as per the Cerner Agreement, TSI gains access to Cerner clients for the purpose of marketing its transcription services. Id. Per the Cerner Agreement, TSI pays fees to Cerner. Id.

In addition to licensing Millennium Objects to its healthcare clients, Cerner has also licensed Millennium Objects to four third-parties, one of which is TSI. Id. ¶ 28. These

---

[1] Because of the high proprietary value of Cerner Millennium, Cerner does not permit licensees access to the program's source code. Affidavit of Scott Stuewe, Director of Application Architecture for Cerner ("Stuewe Aff.") ¶10. Instead, Cerner licenses access to Cerner Millennium's object code. Id. Unlike source code, object code is not human-readable, but is only machine-readable. Id. As a result, licensees cannot, by merely examining object code, duplicate or reverse engineer Cerner Millennium. Id. In addition to licensing Cerner Millennium and healthcare applications that run off Cerner Millennium, Cerner sells licenses that permit Cerner clients and third party developers to incorporate Cerner Millennium functions into their own applications. Id. ¶ 11. But such customization or development activity is not permitted through access to the Cerner Millennium source code. Id. Rather, Cerner sells licenses to Millennium Objects, a program which functions as a "tool kit"or applications programming interface ("API") and which permits a licensee to interface its own applications with Cerner Millennium and thereby incorporate Cerner Millennium functions into its own applications. Id. No one else is privy to the control language developed by Cerner in which Cerner Millennium is written. Id. Millennium Objects, however, permits a third-party to "communicate" with Cerner Millennium, translate the control language, and thereby access data in Cerner Millennium for use in licensees own applications. Id.

third-party licensees are each described on Cerner's Internet website.  See Def. Ex. T.  It is undisputed that this is the only reference to TSI that has ever appeared on Cerner's website.  See Stuewe Aff. ¶13.  According to Cerner, its relationship with TSI, and the three others like it, are publicized on Cerner's website because Cerner is looking to increase the number of such licenses.  Id.  It is further undisputed that Cerner has never in its website referred to any particular automated transcription system belonging to TSI or Protocol.  See Stuewe Aff. ¶ 17.

The only automated transcription system advertised by Cerner or listed on its web site is Cerner's own, called Cerner Medical Transcription Management ("MTM").  Def. Facts ¶ 33; Stuewe Aff. ¶ 18, 19.  TSI and Cerner contend that this system was developed by Cerner and first installed in a client's production environment in 1999, well before TMS was conceived.  Id.  Unlike TMS, Cerner maintains, MTM is not a web or Internet-based system and Cerner has never authorized MTM to be shared with, licensed to, modified by, or utilized by TSI.  Id.  Nor does the October 25, 2002 agreement between Cerner and TSI make any mention of MTM, which is entirely owned by Cerner.  Id.  Whether MTM is an Internet based transcription system, like TMS, is a disputed issue of fact, see Plt. Opp. Mem. at 18-28, but, for the reasons discussed below the issue is immaterial to resolution of this Motion.[2]

---

[2] Specifically, Protocol alleges that  (1) MTM is, in fact, an Internet based system, and that (2) MTM is actually a derivative program of TMS. Plt. Opp. Mem. at 15-17 (citing, inter alia, Ross Dep ¶¶ 36, 37, 38, 39) (Ross's deposition testimony further asserts that a poster termination "Project Requirements" document drafted as part of the Cerner Agreement anticipates that TSI would have internet-based, automated transcription capability that would only be possible through the use of TMS).
In support of these allegations Protocol cites a rather ambiguous description of MTM's capabilities from the Cerner website, which says that

> MTM delivers additional efficiencies to your operations, including . . . Web Access: Enabl[ing] remote transcriptionists to virtually become on-site typists . . .

Because TMS did not work as promised, TSI maintains, in May of 2003 TSI sought to develop a new Internet based automated transcription system dubbed APEX, with a software developer named Sotirios Luridas and his firm Framework Technologies, Inc ("Framework"). Def. Facts ¶ 37.  According to TSI, the development of APEX has not yet been completed.  Id. TSI purports to be currently testing and developing a rendering engine for APEX.  Navin Aff. ¶ 22.  Further, TSI maintains that it has never used APEX nor offered it for sale or licensing. Stuewe Aff ¶ 22.  Under its June 1, 2004 agreement with FTI, TSI is to pay around $468,000 to FTI for development of APEX, in addition to monies for an Oracle license and other salaries and fees, totaling $835,000.  See Navin Aff. ¶ 24.

Protocol alleges that "the 'Apex System,' has to be the exact same TMS system," primarily because the name "APEX" was trademarked and publicized on TSI's website more than a year before the TSI/Framework development deal was consummated.  For the reasons set forth below, however, these facts, and the remainder of the uncontested evidence, are insufficient to save Protocol's legal claims from being dismissed on summary judgment.

---

. Documents never leave the host system, offering the most secure environment for maintaining patient privacy. . . . [Other] Key Features [include] . . . off-site production handled via internet or modem.

Plt. Ex. W (page from Cerner's Internet website).  In addition, Protocol posits that Cerner had to have known about the TMS project because TSI employees with access to TMS source code under the JDA were simultaneously communicating with Cerner in the course of negotiating the Cerner Agreement.  Plt. Opp. Mem. at 15-17 (citing, *inter alia*, Ross Dep ¶¶ 36, 37, 38, 39).
   But even if Protocol's factual allegations are presumed true, the materiality of these facts with respect to Protocol's legal claims remains dubious. The bottom line is that it would be unreasonable for a jury to infer from the mere fact that MTM is an Internet-based system and the fact that Cerner knew about TMS, that MTM is, therefore, a derivative of TMS.  See Plt. Opp. at 25 (suggesting that Cerner "surreptitiously blended and integrated plaintiff's TMS system into Cerner's Millennium Objects).  There is simply no factual allegation or evidence adduced which provides a nexus between the two programs.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996).

In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

Once the moving party has properly supported its showing of no triable issue of fact and an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita, 475 U.S. at 586; see also Anderson, 477 U.S. at 247-48. The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) ("to raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather "must exceed the 'mere scintilla'

threshold"), cert. denied, 507 U.S. 912 (1993).

Section 11.4 of the JDA provided that "This Agreement will be governed by and construed in accordance with the laws of the United States and the State of Illinois, without regard to that body of law controlling conflicts of laws." Accordingly, this Court held in its June 14, 2004 Order that "Illinois law shall govern this action."

### III. DISCUSSION

**A. Breach of Contract (Count One)**

Count I of the Amended Complaint claims, initially, that TSI breached the JDA by engaging in conduct such as "removal and/or conversion of Project Intellectual Property Rights, know-how and Source Code belonging to plaintiff." See Compl. ¶ 66. This allegation was dismissed at oral argument on May 3, 2004, because, as set forth on the record, it is clear that TSI has a joint property right with Protocol and that the JDA excludes Protocol from licensing TMS without TSI's permission.[3] Transcript of Oral Argument held on May 3, 2004, at 23-26. In its oral opinion, the Court was clear that with respect to revenues allegedly owed from the sale or license of TMS, or any derivatives or components thereof, Protocol is asserting a breach of contract claim under the revenue sharing provision of the JDA. Id.

Count I alleges next, that TSI "falsely, maliciously and fraudulently terminat[ed] plaintiff's rights under the agreement, especially . . . [by] dealing with Cerner for the licensing of

---

[3] Section 4.1 of the JDA provides that "Transolutions [TSI] shall be solely responsible, in its discretion, for the marketing of the TMS. Protocol shall not market, license or transfer the TMS, in whole or in party, [sic] to any third party without prior the written consent of Transolutions."

9

the TMS system rights[,] related directly to and violat[ing] the revenue sharing of the parties under the Agreement." Compl. ¶ 67. As Protocol has additionally stated "[t]he gravamen of the amended complaint is that Transolutions sold or licensed the TMS system to Cerner *without paying plaintiff its 50% share of the revenues under the Agreement*," see Plaintiff's Reply in Support of Motion to Amend the Complaint at 9 ("Plt. Reply Mot. to Amend") (emphasis plaintiffs). Section 4.2 of the JDA provides that

> [e]ach party shall be entitled to fifty percent (50%) of the Third Party Revenues generated from the distribution , sale or licence of the TMS, and any components or derivatives thereof. As used herein, "Third Party Revenues" means the gross receipts actually collected by either party from any third party for the distribution, sale, license, maintenance and support of the TMS or any components or derivatives thereof (not including revenues from services provided using the TMS) . . ..

According to this provision, if TSI licensed TMS to Cerner while the JDA was in effect, as Protocol alleges, then revenue would indeed be owed to Protocol. The problem with Protocol's case, however, is that it is unsupported by any evidence in the factual record.

Protocol fails to offer even a shred of evidence that TSI has received revenues from Cerner for anything, no less a license to use TMS. In fact, it is undisputed that the Cerner Agreement provides only that TSI pay certain fees to Cerner and nothing in that agreement calls for Cerner to pay any amount to TSI whatsoever.[4] Even if the Cerner Agreement facilitates TSI's

---

[4] Protocol suggeststhat TSI has received two forms of "indirect" payment from Cerner. First, Protocol suggests that the Cerner customer lists to which TSI receives access under the agreement constitute revenues stemming from TMS. It is clear from the Cerner Agreement, however, that Cerner gets monetary consideration from TSI in exchange for access to these customers. Second, Protocol draws the Court's attention to an article posted on the website of the The Business Journal of Kansas, dated September 17, 2004. See Plt. Ex. L. The article reports that TSI was the recipient of a $5 million investment by the firms Kansas Venture Capital Inc. and MidStates Capital L.L.P. Id. Protocol argues that the investment of these firms is actually a form of indirect payment from Cerner to TSI (for access to TMS): Specifically, Protocol alleges that these firms, which are "in the same location as Cerner," either acted an

10

provision of transcription services to Cerner clients, moreover, because Cerner does not and has not ever paid any fees to TSI, the Cerner Agreement does not generate revenues that would be subject to Section 4.2 of the JDA (even if TMS were used in provision of those services).

Besides the Cerner agreement, Protocol suggests, additionally, that TSI's website reference to TMS is probative of its claim that TSI was selling and/or licensing TMS to third parties without sharing revenues. See Plt. Opp. Mem. at 27. The fact of the website reference was admitted by TSI's Navin, who attested that TMS added this brief reference in 2002 while the JDA was still in effect and the reference, merely descriptive, did not contain an offer to license or sell TMS. Navin Aff. ¶ 15. This evidence, however, does not tend to show that TSI ever used the completed TMS or that it ever sold it to anyone–it is completely immaterial–and even if *arguendo* it did tend to prove the *use or sale* of TMS, Protocol still fails to offer any proof that TSI received third-party *revenues* therefrom.

It should also be noted that Protocol's Opposition raises a new theory of breach of contract not mentioned in the Complaint, which is that TSI and Cerner have used TMS for the transcription of TSI's and Cerner's medical reports, for TSI and Cerner's clients, and that these activities entitle Protocol to revenue sharing under Section 4.2 of the JDA. See Plt. Opp. Mem at 7-8, 10-12, 29-31. Federal Rule of Civil Procedure 8(a)(2) provides, however, that a "pleading which sets forth a claim for relief . . . shall contain a short and plain statement of the claim

---

investor proxy for Cerner, or, alternatively, only invested in TSI because of knowledge about TSI's contract with Cerner. See Plt. Sur Reply at 2. But even if this article were probative of Protocol's allegations, which plainly it is not, the article would still be inadmissible under the hearsay rule. As noted above, only evidence that would be admissible at trial may be used to test a summary judgment motion, see Blackburn v. United Parcel Service, Inc., 179 F.3d 81 (3d Cir. 1999)

showing that the pleader is entitled to relief." Although a complaint's allegations are to be liberally construed, the courts "will not read causes of action into a complaint when they are not present." Krouse v. American Sterilizer Co., 126 F.3d 494, 499 (3d. Cir 1997). It is black-letter law that it is impermissible, without leave of court, to raise new claims for the first time on summary judgment. See In re Cendant Corp. Derivative Action Litig., 96 F. Supp. 2d 394, 398 (D.N.J. 2000). Although Protocol is adamant that the issue of revenues derived from transcription services is the "elephant in the courtroom," see Plt. Opp. at 29, the elephant is conspicuously missing from the Amended Complaint. Protocol has consistently maintained that revenues from the licensing and sale of TMS form the gravamen of its Complaint, see Plt. Reply Mot. to Amend at 9. Revenues derived from the provision of transcription services are an entirely different issue–and one that the Court will not permit to be raised for the first time on summary judgment. In any event, whether or not TSI ever used TMS in its medical transcription business is a non-issue in this case–it is irrelevant because even if TSI did provide services using TMS, Protocol would still not be entitled to any revenues under Section 4.2, which unequivocally excludes "revenues from services provided using the TMS."

     Lastly, Count I alleges that "Transolutions [TSI] breached the Agreement by not accepting the final TMS system designed by plaintiff." Compl. ¶ 67. Section 1.4 of the JDA provides, however, that "[e]ach deliverable provided to Transolutions under this Agreement shall be deemed accepted upon written acceptance of such deliverable by Transolutions." This Section clearly contemplates the correlative right *not* to accept in writing. Here, it is undisputed that the final version of TMS, delivered on October 13, 2002, was never accepted by TSI in writing. See Ross Dep. at 243-44. Since refusal to accept is clearly contemplated by the JDA, it cannot be

12

considered a breach of that agreement.[5] To the extent that TSI's alleged use of TMS is intended to show that TSI's termination of the JDA was without cause, moreover, it remains immaterial because, as discussed below, Section 1.4 permits TSI to terminate the agreement without cause.

Ultimately, Protocol's failure to adduce any "evidence on which the jury could reasonably find for" Protocol requires that summary judgment as to Count I, for breach of contract, be granted.

### B. Fraud (Count Two)

Count II of the Amended Complaint alleges that TSI

> is guilty of fraud in inducing [Protocol] to execute the Agreement and fully perform its obligations thereunder, knowing that it intended to license the TMS system to others, in this case Cerner, illegally, maliciously, fraudulently and deceptively, in violation of such Agreement, and to wrongfully and fraudulently terminate plaintiff's rights thereunder, and in denying such licensing of the TMS system to Cerner. . . . and in the execution and performance of the [Cerner] Agreement with Cerner an agreement for the licensing and sale of the TMS system while the [JDA] was in full force and effect, and by continuing to act to the exclusion of plaintiff, to the unjust enrichment of both defendants.

Complaint ¶ ¶ 71-72. As noted above, this Court has previously dismissed Protocol's claim of fraud in the execution of the Cerner Agreement to the extent that it is based on allegations of misappropriation the TMS source code. Protocol's allegation that TSI had no intent to perform under the JDA states a claim for promissory fraud.

"'Promissory fraud' is a false representation of intent concerning future conduct, such as a promise to perform a contract when there is no actual intent to do so." Houben v. Telular Corp., 231 F.3d 1066, 1074 (7th Cir. 2000). Under Illinois law, Protocol must prove intent to

---

[5] To the extent that Count I also claims that TSI's failure to accept TMS was "malicious and fraudulent," the Court will consider fraudulent termination in the context of Count II, below.

defraud (or any other allegation of fraud) by clear and convincing evidence, a heavy burden. Athey Prod. Corp. v. Harris Bank Roselle, 89 F.3d 430, 434 (7th Cir. 1996) (citing State Security Ins. Co. v. Frank B. Hall & Co., 630 N.E.2d 940, 943 (Ill. 1994)).  In Illinois, moreover, "courts consider clear and convincing evidence to be more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense." Parsons v. Winter, 491 N.E.2d 1236, 1240 (Ill. App. 1986).  It is by this clear and convincing evidentiary standard that the Court must decide whether the opposing party's evidence of alleged fraud is sufficient for a jury to find for that party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 ("[I]n ruling on a motion for summary judgment the judge must view the evidence presented through the prism of the substantive evidentiary burden.").

      Here, Protocol does not even come close to meeting the "clear and convincing" evidentiary standard.  Protocol has offered no evidence–no less clear and convincing evidence– that when TSI signed the JDA it did not intend to perform any of its obligations under that contract.  Protocol argues that two mutually-agreed-upon provisions of the JDA–the provision for arbitration and the provision for termination–are evidence of TSI's intent not to perform.  See Plt. Opp. at 34.  This argument is baseless:  Not only are such provisions standard in commercial contracts, but there is no evidence whatsoever that TSI failed to carry out its promise to share revenue arising from the license or sale of TMS–since there is no evidence of any such license, sale, or, for that matter, any such revenues.

      The undisputed evidence here–that TSI indeed paid its full obligation under the JDA–weighs heavily against Protocol's assertion that TSI intended not to perform its obligations. Any claims that Protocol may have asserted with respect to fraudulent inducement and

fraudulent termination, moreover, are intertwined with Protocol's promissory fraud allegation, see Compl. ¶ 71, and, to the extent they depend on TSI acting with wrongful intent at the time the JDA was executed, are likewise unsupported by any evidence.

Nor are Protocol's independent claims of fraudulent inducement or fraudulent termination, as asserted in Count II, Compl. ¶¶ 72-73, supported by any evidence. With respect to termination, Section 7.2 of the JDA unambiguously sets forth TSI's rights under the JDA:

> Termination: Prior to the Acceptance Date, Transolutions may terminate this Agreement by thirty (30) days prior written notice to Protocol. In addition, if either party is in material breach of the provisions of this Agreement, and fails to cure such breach within (60) days after written notice thereof, the other party may terminate this Agreement by subsequent written notice to the breaching party.

As noted above, Section 1.4 of the JDA defined "Acceptance Date" as the date on which "the completed TMS is accepted by Transolutions" in writing, and that Section 7.3 of the JDA provides that the revenue sharing provision of Section 4.2 survives termination of the agreement. See Def. Reply at 27.

Here, it is undisputed that the final version of TMS was never accepted in writing. See Ross Dep. at 243-44; Def. Ex. Q (e-mail from Ross to Navin et al., dated December 9, 2002) ("We will be supplying you with a formal request for acceptance testing as per my email I sent both of you this last Saturday"). It is further undisputed that in a letter dated December 4, 2002, TSI exercised its right under Section 7.2 to terminate the JDA upon 30-days notice, effective January 3, 2003. See Def. Ex. W (termination letter); Def. Ex. R (letter from Ross to Randall E. Kay, dated  February 14, 2003) ("For the record, it should be pointed out that TSI chose to cancel the JDA, Protocol has acknowledged this cancellation, and the JDA is, in fact, cancelled as of January 3, 2003"); see also Jesperson v. Minnesota Min. and Mfg. Co., 700 N.E.2d 1014, 1016,

1017 (Ill. 1998) (interpreting a provision similar to Section 7.2 of the JDA as "an express, unfettered right to terminate the agreement upon proper notice").[6] Thus, it is abundantly clear that since the right of termination was exercised prior to acceptance of the final version of TMS it can not be deemed to have been fraudulent.

Nor, under Illinois law, was TSI's right to terminate constrained by a duty of "good faith." As TSI correctly cites, "[t]he implied covenant of good faith and fair dealing does not require a party with discretion to forbear from exercising its right to terminate a contract for the benefit of the other party to the agreement. Parties are entitled to enforce the terms of their negotiated contracts to the letter without being mulcted for lack of good faith." See Mid-West Energy Consultants, Inc. v. Covenant Home, Inc., 815 N.E.2d 911, 916 (Ill. App. 2004). "[T]he duty of good faith and fair dealing does not override the clear right to terminate at will, since no obligation can be implied which would be inconsistent with and destructive of the unfettered right to terminate at will." Jespersen v. Minnesota Mining & Mfg. Co., 681 N.E.2d 67, 71 (Ill. App. 1997), aff'd, 700 N.E.2d 1014 (Ill. 1998).

Lastly, Count II claims that TSI fraudulently induced Protocol to enter the JDA by "promising enormous revenues." See Plt. Opp. at 33-34. Generally, however, "financial projections are considered to be statements of opinion not fact," and "[p]redictions about the future are opinions and not actionable under a theory of fraud." Lagen v. Balcor Co., 653 N.E.2d

---

[6] As TSI points out, Protocol refers in its Brief to a prior 60-day cancellation letter "[i]n November 2002," see Plt. Opp. at 9, but fails to produce such a letter or even refer to it in any affidavit. These and other unsupported representations throughout Protocol's brief cannot create disputed issues of fact on summary judgment. In addition, Protocol's assertion that TSI's December 4, 2002 letter was "on the advice of counsel" and written "only because their lawyers told them to do so," is unsupported by the letter itself, and if even true, is irrelevant to the issue of effective termination.

968, 973 (Ill. App. 1990); <u>Lidecker v. Kendall College</u>, 550 N.E.2d 1121, 1125 (Ill. App. 1990) (citing <u>Steinberg v. Chicago Medical School</u>, 371 N.E.2d 634 (Ill. 1977)).

Upon examination of Protocol's so-called evidence of "inducement," the Court finds nothing but opinions and predictions, in other words, mere puffery. For example, the e-mail cited from Richard Cussigh to Jay Ross, dated February 8, 2001, states that "[o]ne of the important questions we have to answer is whether there is a global market for this application." <u>See</u> Plt. Ex. C (e-mail from Richard Cussigh to Jay Ross, dated February 8, 2001). The e-mail goes on to opine on the size of the transcription service market, as a whole. <u>Id.</u> Protocol also cites a May 30, 2001 e-mail from Cussigh–written after the JDA was executed–which states that "[s]elfishly, my hope is that this system leads to a generous 'Jay Ross Retirement Fund'. If that hope comes true, everyone wins." <u>See</u> Plt. Ex. E (e-mail from Richard Cussigh to Jay Ross, dated May 30, 2001). To the extent that such promises of revenue sharing were part of the deal JDA in Section 4.2 and, which superceded prior oral representations through the Integration Clause in Section 11.6, they cannot form the basis of a promissory fraud claim. <u>See</u> <u>Cromeens, Holloman, Sibert, Inc. v. AB Volvo</u>, 349 F.3d 376, 394 (7th Cir. 2003) (holding, in light of integration clause, that a party is not justified in relying on representations outside of or contrary to the written terms of a contract he or she signs when the signer is aware of the nature of the contract and a full opportunity to read it).

For all of the reasons above, there is no clear and convincing "evidence on which a jury could reasonably find for" Protocol. Thus, Count II must be dismissed.

**C. Tortious Interference with Contract (Count Three)**

Count III is a claim against Cerner for intentional interference with the JDA. In order to

prevail on a claim for intentional interference with a contract in Illinois, the plaintiff must show that: (1) there was an enforceable contract, (2) the defendant was aware of that contract, (3) the defendant intentionally and unjustifiably induced a breach of the contract, (4) breach resulted from the defendant's wrongful conduct, and (5) the plaintiff has been damaged. Smock v. Nolan, 361 F.3d 367, 372 (7th Cir. 2004). Besides some evidence offered to show that Cerner "must have known" about the JDA because an employee from TSI, who had access to TMS code, was also working on a "Project Requirements" document with Cerner (related to the Cerner Agreement with TSI), see, supra, note 2; Plt. Opp at 17, Protocol offers no evidence to prove the remaining elements of tortious interference claim.[7]  Critically, even if Cerner did know about the JDA, because Protocol has adduced no evidence that TSI breached the JDA, see Section III.A, supra, Protocol cannot establish the third element of its tortious interference claim. For these reasons, Count III must be dismissed.

**D. Civil Conspiracy**

Lastly, in Count I and Count II, Protocol intimates that Cerner conspired with TSI to breach the JDA. See Compl. ¶¶ 51, 75. "Conspiracy[, however,] is not an independent tort. Where, as here, plaintiff fails to state an independent cause of action underlying his conspiracy

---

[7] As with the bulk of Protocol's Opposition, the arguments devoted to "Intentional Interference with Contract," pages 36-37, fail to cite any evidentiary support from the record and rely on pure speculation. In this section, Protocol cites Anderson v. Liberty Lobby, for the proposition that "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." See Plt. Opp. at 37 (citing Anderson, 477 U.S. 242, 269 (1986)). The Court directs Protocol's attention to the first two words of that quotation, "*the evidence*"–because Anderson does not permit Protocol to rely to inferences drawn from other inferences, Protocol cannot survive summary judgment without offering some evidence to support its allegations. The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324.

allegations, the claim for conspiracy also fails." Thomas v. Fuerst, 803 N.E.2d 619, 625-626 (Ill. App. 2004). Thus, because Protocol's allegation of civil conspiracy is based on wrongs alleged in the rest of the Complaint, all of which have been dismissed, this allegation too, fails to survive summary judgment.

### E. Plaintiff's Counterclaim

Defendants correctly point out that Protocol admits liability on TSI's counterclaim for repayment of a loan made by TSI to Protocol in the principal amount of $10,000.00 evidenced by a promissory note dated May 10, 2002, with a maturity date of November 10, 2002, at which time "the entire outstanding balance and all unpaid accrued interest will be due" and for "interest at an annual interest rate on the outstanding principal amount of 7%" and that if interest is not paid when due, it shall thereafter bear interest at the same rate as the principal bears interest." See Revised Joint Final Pretrial Order at 3 (stipulation of facts). Interest due on November 10, 2002 was $10,000 x .07 x .5 (½ year) or $350. As a result, on November 10, 2003 Protocol owed $10,000 in principal and $350 in interest for a total due of $10,350. Accruing per diem interest is therefore $10,350 x .07/365 or $1.98/day. Id. Protocol's position has been that the amounts it owes should be set-off against its alleged damages. Id. at 10. Because every Count of Protocol's Complaint has been dismissed in its entirely, TSI's Counterclaim is granted, and Protocol's liability under the May 10 note shall become immediately due upon issuance of this Opinion and accompanying Order dated the same.

### IV. CONCLUSION

For the reasons set forth above, Protocol has failed to meet its burden to produce

19

"evidence on which the jury could reasonably find for the [nonmoving party]." <u>Anderson</u>, 477 U.S. at 252. Summary judgment is therefore granted in favor of TSI and Cerner on all Counts.

                                                 /s/
                                       Stanley R. Chesler,
                                       U.S. District Judge

Dated: April 29, 2005